JOHN A. EBY and MILLARD CHEEK, Partners, Doing Business under Firm Name of THE EBY-CHEEK MOTOR COMPANY, v. GEORGE E. WILSON ET AL; GEORGE E. WILSON and FRANK HULL, Appellants.

Division One, November 15, 1926.

1. **LIBEL: Classes· Necessary and Special Damage.** Defamatory words are divisible into two classes: (a) those which are libelous per se, and which necessarily, or by presumption of evidence, occasion damage, for which general damages may be recovered, without any evidence of damage other than that which is implied or presumed from their publication; and (b) those which do not necessarily, but do by a natural and proximate consequence, occasion damage, and for the publication of which only special damages are recoverable, and then only because alleged and proved.

2. ———: **Dishonesty in Business: General Damages: Pleading.** Words written or spoken of one's trade are actionable when they might not be if

spoken of him simply as an individual. Every wilful and unauthorized defamatory publication which imputes to a merchant dishonesty in the conduct of his business is libel and implies malice; and if the allegations connect the defamatory words with the merchant's business, he is entitled to general damages, without proof of special loss.

3. ———: **Sale of Mortgaged Property.** A letter addressed by a bank to a purchaser advising him that the bank holds an unsatisfied mortgage on the automobile which he purchased from a named motor company, which he had purchased and paid for before the mortgage was executed, is a libel upon the partners constituting the motor company. It does not in and of itself charge or necessarily impute fraud; but the addressee necessarily understood that the partners had sold to him a mortgaged automobile without the consent of the bank, and it necessarily created in his mind a belief that he had been defrauded, and imputed to the partners an act which tended to deprive them, in their character as dealers in automobiles, of public confidence, and was per se libelous of the partners in their business and must be presumed to have occasioned damage, and therefore recovery of general damages without proof of special injury or loss was allowable.

4. ———: ———: **Privilege: Statement by Plaintiff: Immaterial.** A statement made by one of the partners who were dealers in automobiles to a committee of the bank who visited their place of business to determine what automobiles covered by its mortgage were on hand, that he had sold one of the mortgaged cars to a certain purchaser, made before the bank wrote a letter to such purchaser advising him that the bank held an unsatisfied mortgage on said car, did not render such letter qualifiedly privileged, where (a) said partner also stated that he would examine the books and see to whom they had sold cars, but they were not sufficiently interested to have him do so; (b) they did not notify him of the purpose of the inquiry as to who were purchasers of cars; (c) the cars, after the mortgage was given, were being sold with the consent and urgency of the bank; and (d) the particular car sold to the addressee of the letter had been sold and paid for before the mortgage was executed. Under such circumstances the statement was incidental and immaterial.

5. ———: **Letter Asserting Mortgage on Sold Automobile: Consent of Mortgagee to Sell: Waiver: Privilege.** It being understood that dealers in automobiles were to sell them in the usual and natural course of business after they had executed a chattel mortgage to a bank on all of them, and the bank having knowledge that they were being so sold, the bank waived, as against a purchaser of any such car, its mortgage lien upon them, and cannot be heard to assert that its letter to such purchaser, advising him that it held an unsatisfied mortgage on the car purchased by him, was privileged.

6. **INSTRUCTION: Libel: Defamatory Letter: Proof of Addressee's Understanding.** The bank having addressed a letter to a purchaser advising him that it held an unsatisfied mortgage upon an automobile purchased by him from plaintiffs, whereas he had purchased and paid for the car before the mortgage was executed, it was not necessary that the instructions require the jury to find that the purchaser understood the letter to have a defamatory meaning. He necessarily understood that the letter imputed dishonest dealing to the plaintiffs.

7. ———: ———: **Hypothesizing Crime.** Where the letter made the basis of the libel suit is libelous per se, it is not necessary to determine whether it charged a crime, and therefore an instruction containing an abstract proposition of law to the effect that the law implies damages from the writing and publishing of words charging a crime is not materially erroneous.

8.  **LIBEL: Republication: Nominal Damages: Excessive Verdict.** The verdict cannot be limited to nominal damages in an action wherein libel **per se** is established.  The libel contained in a letter addressed by a bank to the purchaser advising him that it holds an unsatisfied mortgage on an automobile purchased by him from plaintiffs was circulated and republished when he and other purchasers who received similar letters came immediately to plaintiffs with their friends and attorneys with complaints based upon the letters; and in such circumstances, where there is testimony that there was a considerable decrease in the amount of their sales after the writing of the letters, there is no scale by which the damages to plaintiff's business can be graduated with certainty, and it will not therefore be held that a verdict for three thousand dollars for actual damages was excessive.

---

Corpus Juris-Cyc. References:  **Appeal and Error,** 4 C. J., Section 3013, p. 1029, n. 30.  **Libel and Slander,** 36 C. J., Section 17, p. 1150, n. 72; p. 1151, n. 90; p. 1152, n. 99; Section 69, p. 1180, n. 2, 3, 4; p. 1181, n. 8; Section 93, p. 1190, n. 84; Section 163, p. 1215, n. 43; Section 208, p. 1243, n. 65; 37 C. J., Section 358, p. 36, n. 26; Section 516, p. 91, n. 32, 35, 41; Section 547, p. 101, n. 33; Section 556, p. 109, n. 32, 34; p. 110, n. 43; Section 561, p. 113, n. 4; Section 590, p. 129, n. 26.  **Trial,** 38 Cyc. p., 1778, n. 73; p. 1779, n. 75; p. 1785, n. 90.

Transferred from Kansas City Court of Appeals.

AFFIRMED.

*Craven & Bates* for appellants.

(1)  Words are libelous *per se*, which within themselves necessarily carry a defamatory meaning, and are not libelous *per se* if susceptible of a reasonable interpretation excluding a defamatory imputation. The letter complained of does not necessarily carry a defamatory meaning, and is therefore not libelous *per se*.  Rail v. Nat. News. Assn., 198 Mo. App. 463; Lemaster v. Ellis, 173 Mo. App. 332; State ex rel. Nat. News. Assn. v. Ellison, 200 S. W. 433; Kuntz v. Hartwig, 151 Mo. App. 94; Walsh v. Pulitzer Pub. Co., 250 Mo. 149.  (2)  The letter not being libelous *per se* and the petition not pleading special damages does not state a cause of action, because when a writing is not libelous *per se* the petition containing the libelous charge does not state a cause of action, if no special damages are pleaded.  Furlong v. German Am. Press, 189 S. W. 390; Mitchell v. Bradstreet Co., 116 Mo. 226; Hammel v. Otis, 60 Mo. 365; Curry v. Collins, 37 Mo. 324; Spurlock v. Inv. Co., 59 Mo. App. 225; Caffey v. Moffatt, 246 S. W. 51.  (3)  Where words are not actionable *per se* and damage to business is alleged the petition must set forth the particular contracts, sales, improvements, customary patients or clients, as the case may be that have been lost by reason of the publication of the alleged libel.  The petition does not contain any such damages.  25 Cyc. 437, 453, 454, 455 and notes; Rammel v. Otis, 60 Mo. 365; Filatow v. Von Bremsen, 11 N. Y. Supp. 680; Reusch v. Roanoke Cold S. Co., 91 Va. 534.  (4)  The letter in question is a privileged communication because "the rule is that a communication made in good

faith, upon any subject matter in which the party communicating has an interest, or in reference to which, has a duty, public or private, either legal, moral or social, if made to a person having a corresponding interest or duty, is privileged; that in such case the inference of malice is cast upon the person claiming to have been defamed." Hancock v. Blackwell, 139 Mo. 440; Marks v. Baker, 28 Minn. 163; Finley v. Steele, 159 Mo. 299; Sullivan v. Comm. Co., 152 Mo. 268; Holmes v. Fraternal Union, 222 Mo. 556; Wagoner v. Scott, 164 Mo. 289; Gary v. Jackson, 197 Mo. App. 217, 193 S. W. 920; Cook v. Reeler Co., 241 Mo. 359; Radford v. Horton, 227 S. W. 1073; Clark v. McBaine, 252 S. W. 428. (5) Where a letter complained of as being libelous is a privileged communication as disclosed by the admitted facts, it is the duty of the court to direct a verdict for the defendant, when there was no evidence of express malice. The court, therefore erred in failing to direct a verdict for defendants. Sullivan v. Comm. Co., 152 Mo. 268; Holmes v. Fraternal Union, 222 Mo. 556; Tilles v. Publishing Co., 241 Mo. 609. (6) Instruction 1 given by the court on behalf of the plaintiffs is erroneous because it did not leave it to the jury to find what the understanding of the party receiving the letter was. Lemaster v. Ellis, 173 Mo. App. 341; Walker v. Hoeffner 54 Mo. App. 554; Unterberger v. Scharff, 51 Mo. App. 102; Bridgeman v. Armor, 57 Mo. App. 528; Christal v. Craig, 80 Mo. 373; Julian v. K. C. Star, 209 Mo. 35, 79; Diener v. Star-Chronicle Pub. Co., 230 Mo. 629. (7) Instruction 7 is erroneous because, first, it assumes that there was an implication in the letter charging the commission of a crime by plaintiffs and that criminal imputation had been attached to the letter by the allegations of the petition and proof; second, because malice is not inferred from the letter written; third, it is misleading in the measure of damages. Holmes v. Fraternal Union, 222 Mo. 556; Finley v. Steele, 159 Mo. 299; Wagner v. Scott, 164 Mo. 289; Sullivan v. Comm. Co., 152 Mo. 268; 25 Cyc. 530. G, 2; Arnold v. The Savings Co., 76 Mo. App. 175. (8) The judgment is excessive. Hagemer v. Publishing Co., 172 Mo. App. 436. (9) The general rule is that the author of a libel or slander incurs no liability, either as on a distinct cause of action or by way of enhancing the damages of the original defamation, for a voluntary and unauthorized repetition or republication of the libelous or slanderous matter by others who act independently. 25 Cyc. 506 (G.); Hereford v. Combs, 126 Ala. 360; Age-Herald Pub. Co. v. Waterman, 188 Ala. 272; Adams v. Cameron, 27 Cal. App. 625; Clifford v. Cochrane, 10 Ill. App. 570; Cates v. Kellogg, 9 Ind. 506; Prime v. Eastwood, 45 Iowa, 640; Zurawski v. Reichmann, 116 Iowa. 388; German Sav. Bank v. Fritz, 135 Iowa, 44; Mills v. Flynn, 157 Iowa, 477; Dickens v. Shepherd, 22 Md. 399; Hartings v. Stetson, 30 Am. Rep. 683; Shurtleff v. Parker, 39 Am.

315 Mo.—77.

Rep. 454; Elmer v. Fessenden, 5 L. R. A. 724; Burt v. Advertiser News. Co., 154 Mass. 238, 13 L. R. A. 97; Olmsted v. Simpson, 66 Barb. 492; Terwilliger v. Wande, 72 Am. Dec. 420; Bassell v. Elmore, 48 N. Y. 561; Schoeplin v. Coffey, 162 N. Y. 12; King v. Sassaman, 54 S. W. 304; Gough v. Goldsmith, 28 Am. Rep. 579.

*Lawson & Hale* and *Harris L. Moore* for respondents.

(1) . The letter is libelous *per se.* It plainly imputes dishonest dealing, and the statutory crime of selling mortgaged property. This is especially true where the facts outside the letter are admitted. In fact, the letter itself substantially states all the facts, at least by implication. "This is to inform you" is equivalent to saying that the addressee did not know the fact. "Unsatisfied mortgage" is equivalent to a statement that the bank had not consented to the sale, and the defendants substantially put this construction in exactly the same letter written to another person. Hughes v. Samuels, 159 N. W. 589; Turner v. Brien, 167 N. W. 584; Townshend on Slander and Libel (4 Ed.) secs. 146, 147; Newell on Slander and Libel (3 Ed.) p. 334; Walsh v. Publishing Co., 250 Mo. 142; Flowers v. Smith, 214 Mo. 98, 136; Mitchell v. Bradstreet, 116 Mo. 240; State v. Armstrong, 106 Mo. 395; Dobbin v. Railway, 157 Mo. App. 689; Pratt v. Pioneer Press, 28 N. W. 708; Cooks v. Publishing Co., 241 Mo. 325; Minter v. Bradstreet, 174 Mo. 444. (2) The letter was not a privileged communication. The bank, in fact and in law, had no mortgage on any of the cars, and it never had had any mortgage on the Dieter car, the item on which the jury returned the verdict. 25 Cyc. 385; Sullivan v. Comm. Co., 152 Mo. 268; Finely v. Steel, 159 Mo. 299; Peak v. Taubman, 251 Mo. 390. (3) It was not necessary to instruct the jury that they must find how the party receiving the letter understood it. This only applies where the language is ambiguous. In the present case, there could not possibly be two constructions of the statement made. Instruction 1 is not erroneous in this respect. Israel v Israel, 109 Mo. App. 381. (4) Instruction 7 is not erroneous. The letter being libelous *per se,* malice is inferred. (5) The judgment is not excessive. As compared with judgments in similar cases, it was extremely conservative, when the size of plaintiffs' business is taken into consideration, together with the fact that the letter was written by a bank, and its apparent truth, and consequently damaging effect, was backed up by unreleased mortgages, and the further fact that the bank and its officers did nothing to mitigate the damage, but in every way they could intensified it.

LINDSAY, C.—This is a suit for libel wherein the plaintiffs had a verdict and judgment against George E. Wilson, and Frank R.

Hull, two, of a number of defendants, and the defendants just named were allowed their several appeals to the Kansas City Court of Appeals. Upon the hearing, two of the judges concurred in an opinion for the affirmance of the judgment, but one of the judges dissented, expressing the view that the opinion of the majority was in conflict with certain decisions of this court, and upon his request, the cause has been transferred to this court for final determination.

The plaintiffs were dealers in automobiles at Excelsior Springs, and the defendants Wilson and Hull were, respectively, president and cashier of the Bank of Excelsior Springs. The other defendants joined were directors of that bank. The petition contained six counts, and each count was based upon a letter written by defendant Hull, as cashier; but the letters were worded alike, except that each letter was written to a different person. The plaintiffs dismissed their suit as to the fifth count, and the jury found for the defendants upon all the counts except the first, and upon the first count returned a verdict against defendants Wilson and Hull, in the sum of $3,000 as actual damages. There was a prayer for punitive damages, but no allowance of punitive damages.

The petition set forth the character of the business of plaintiffs, and the further material allegations of the first count are as follows:

"That on or about the nineteenth day of May, 1920, the plaintiff sold to a customer, one Hugo Deiter, a Chevrolet Touring Car, numbered 722,990, and represented said car to be free and clear of any mortgage, and the said Deiter paid the plaintiffs the full price of said car, to-wit, the sum of $886.85; that all of said facts were well known to the defendants.

"That defendants wickedly and maliciously conspired together to injure the plaintiffs in their said business and in their good name and repute as honest dealers in motor cars and trucks, and for that purpose did falsely, maliciously and wrongfully write a certain letter to said Hugo Deiter, in which letter they stated of and concerning the plaintiffs and of and concerning the said car so purchased by Hugo Deiter the following false and libelous matter to-wit:

BANK OF EXCELSIOR SPRINGS,
Excelsior Springs, Missouri.

George E. Wilson, President,
William H. Lyle, Vice-President,
Frank R. Hull, Cashier,
W. B. Greason, Asst. Cashier.

April 14, 1921.

Mr. Hugo Deiter,
City,
Dear Sir:—
    Please be advised that we hold an unsatisfied mortgage on the Chevrolet Touring Car which you purchased from the Eby Motor Company.

Yours very truly,
FRANK R. HULL, Cashier.

"That the defendants meant by said letter, and the said letter was understood by the said Hugo Deiter to mean, that the plaintiffs had wrongfully, fraudulently and dishonestly sold to said Hugo Deiter a car that was mortgaged, without notifying or letting the said Hugo Deiter know of the existence of said mortgage and had collected from him the full value of said car; that plaintiffs were guilty of a felony by fraudulently selling said motor car without the written consent of the Bank of Excelsior Springs and without informing said Hugo Deiter that said car was mortgaged."

There was also an allegation that by reason of the writing and publication of the letters, plaintiffs had lost customers and were injured in their business. The answer admitted the writing of the letters to the persons named in the several counts, and averred that each of the cars was sold without the consent of said bank; that the letters were written in good faith; that the parties to whom the letters were written had corresponding interests in the cars purchased and that each of the said letters was a privileged communication. The answer set up the making of two several chattel mortgages by plaintiffs to said bank, and pleaded also that prior to the writing of the letter to Hugo Deiter, mentioned in the first count, Millard Cheek, one of the plaintiffs, notified defendants that the car sold by plaintiffs to said Hugo Deiter was covered by the mortgages mentioned, and that at the time said letter was written by defendant Hull, he relied upon the statement made by said Cheek that the car sold to Deiter was covered by a mortgage to said bank, and that thereby plaintiffs were estopped from denying that the mortgage covered said automobile.

The substance of the evidence as developed in the trial is stated in the majority opinion as follows:

"For sometime prior to June 12, 1920, plaintiffs were borrowers of money from the bank and had become indebted to it at one time to the extent of $20,000 or $21,000. On June 12, 1920, the bank asked for a chattel mortgage on plaintiffs' stock of automobiles to secure the amount then due. This mortgage was executed and filed with the Recorder of Deeds. It purported to secure $13,000, which plaintiffs then owed the bank. It was agreed orally that plaintiffs should continue to sell cars and plaintiffs continued without interruption to sell automobiles through the summer of 1920. The money received from the sale of the cars was deposited in the bank, and the cars as they were sold were checked off of a list kept by Perrett, the cashier. Nothing was said about releasing from the lien of the mortgage the cars sold. On August 16, 1920, many of the cars covered by the bank's mortgage having been sold, new cars taking their place and the notes evidencing the bank's debt having been changed, the bank took a new mortgage covering the whole of plaintiffs' stock. While the first mortgage was filed it was never released as agreed between the par-

ties, although the second mortgage was taken to secure the whole indebtedness due the bank on August 16th, the date the second mortgage was taken. The mortgages contained a provision that in case of a sale or disposition of the property covered, the bank could take possession of all the property and sell the same for its indebtedness. The second mortgage also contained a provision contemplating the sale of cars by plaintiffs and provided for an accounting to the bank for the proceeds.

"About this time the defendant Hull became the cashier of the bank and soon plaintiffs became tardy in the payment of their notes and were being continually urged by the bank to reduce their indebtedness. Finally at the time of the writing of the letters complained of, the indebtedness had been reduced to $3100. In the meantime plaintiffs and their friends had become the owners of a majority of the stock in the bank and had unsuccessfully attempted to oust defendants as officers of the bank. Hard feeling was engendered over this action. After this, in April, 1921, the bank sent a committee, composed of defendant Wilson, and two members of the board of directors, to plaintiffs' place of business, with instructions to check up the cars then on the floor that constituted the bank's security. The evidence is undisputed that none of the plaintiffs knew that this visit was for any other purpose than to ascertain whether the amount of stock on hand was sufficient to secure the indebtedness. Plaintiff Cheek was in charge and gave the information requested. The committee would examine its list and ask Cheek whether the car had been sold and he would tell them and they would examine the numbers on the car to verify the information that the car was unsold. The committee did not tell Cheek that they were there to see where the cars had gone, but in checking over the cars they did ask him, incidentally, to whom he had sold the Chevrolet cars and he mentioned five or six purchasers. They asked him if he knew to whom these cars went, and he replied, 'I could get my book and see,' but they said, 'O, no, just give the names that you sold to.' Cheek testified: 'I think I mentioned Mr. Deiter and Mr. Mahaffie and Mr. Corkle and Mr. Males from St. Joseph and possibly one or two others.' When they finished checking over the cars, there were still unsold subject to plaintiffs' mortgage fourteen cars of the value of eight or nine thousand dollars.

"After the committee left plaintiffs' place of business, the cashier of the bank consulted its attorney about proceeding with the collection of its indebtedness and the advisability of taking possession of the cars under the mortgage. The cashier was informed by the attorney that on account of the fact that a number of the cars had been sold and no action had been taken by the bank, it would be advisable to let the parties who purchased the cars know that the bank was

still looking to these cars and that they were covered by the mortgages. This was defendants' evidence. No intimation was given to plaintiffs as to what was in the minds of the defendants in regard to this matter. In this situation Hull wrote on the bank's stationery a letter, couched in the language of the letter sued on in this case, to every person that he thought had purchased a car from plaintiffs that had ever been covered by the bank's mortgages. The car sold to Deiter had never been covered by either of these mortgages. In fact, it was sold before the first mortgage was executed.

"There was testimony on the part of plaintiffs that after the writing of these letters there was a material falling off in the amount of their sales; that upon the receipt of the letters the addressees immediately came to see plaintiffs about the matter; that they usually had someone else with them, sometimes their attorney."

The primary question in the case is whether plaintiffs are entitled to recover general damages. The case was submitted on the theory that they were. The determination of that question turns upon the class to which the alleged libel belongs, and whether the writing was libelous *per se,* in the sense in which that term is used.

**Classes of Libel.** Courts and writers of text-books have divided defamatory words into two classes: Those which are said to be libelous *per se,* for which general damages may be recovered, and those designated as libelous *per quod,* and on account of which special damages only are recoverable, and then only because alleged and proved. The distinction is outlined in Section 4, Libel and Slander, 17 Ruling Case Law, 264-5, and a similar statement may be found in 36 Corpus Juris, page 1150. In Townshend on Libel and Slander (4 Ed.), section 146, the author divides language written or spoken of another and of his affairs, and causing him pecuniary loss, into two classes: That which necessarily, in fact, or by a presumption of evidence, occasions damage, and that which does not necessarily, but does by a natural and proximate consequence, occasion damage. He then continues: "The loss which ensues as a '*necessary consequence,*' is termed damage; the loss which ensues as a '*natural and proximate consequence,*' is termed '*special damage.*' One and the same set of words may both necessarily occasion damage, and also occasion damage as a natural consequence.

"147. Language of the first of these classes is commonly termed libelous *per se,* or actionable *per se,* because its publication confers a prima-facie right of action, and is prima-facie a wrong without any evidence of damage other than that which is implied or presumed from the fact of publication. Probably language of this class might more correctly be termed injurious *per se,* or language which imports damage.

"148. The publication of language of the second of these classes does not, *per se*, confer a prima-facie right of action, and is not, *per se*, a prima-facie wrong. It confers a right of action only in those cases in which as a natural and proximate consequence of the publication, loss (special and damage) has in fact ensued to him of whom or of whose affairs the language was concerning."

Further on, in Section 188, somewhat more specifically he states the test to be applied to determine whether language used is to be regarded as actionable *per se*: "Although every lawful lucrative occupation is, as regards the actionable quality of language, governed by the same general principles, yet the kind of occupation affects the application of the principles, and the identical language which may not be actionable as concerning one in some certain occupation, may be actionable as concerning one in some other occupation. The test in every case by which to decide if the language be actionable, meaning actionable *per se*, is, does it necessarily occasion damage? and because the language which may necessarily occasion damage in one occupation will not have that effect in some other, it happens that in every case regard must be had to the character of the occupation." The question here is not so much whether the letter in question is actionable under the attendant circumstances, but rather whether it is actionable *per se* in the sense and for the reason that it must be presumed that damage necessarily resulted from its publication.

Letter:
Libel
Per Se.

The case principally relied upon by defendants is Rammell v. Otis, 60 Mo. 365. In that suit, which was one for slander, the words spoken of the plaintiff were: "Rammell does not keep honest books." The plaintiff was a miller, and the petition set forth the fact that he was a miller, and operating a grist mill, and that the words were spoken of him and his conduct in that business. It was there said: "It is a well-established principle, that to maintain an action for words spoken the words must either have produced a temporal loss to the plaintiff, etc., or they must impute some matter in relation to his particular trade or vocation, which, if true, would render him unworthy of employment. Any charge of dishonesty against an individual, in connection with his business, whereby his character in such business may be injuriously affected, is actionable. If spoken of him individually, and not in connection with his office or business, they would not be actionable. But where the words are not actionable in themselves, and cannot be made so by any matter of inducement whereby they could be made to impute an indictable offense which would be punishable by a corporal punishment, and the ground of complaint is, that the plaintiff has been injured in respect to his character and reputation, his trade and business, or his profession or occupation, the action cannot be maintained without an averment

that the words were spoken of the plaintiff in reference to some one of these things; and, then the words become actionable, only by reason of some special damage, which must be particularly averred and proved.'' The holding was that the words were not actionable in themselves, and only became so by alleging they were spoken of and concerning the plaintiff in his trade or business, and, that to maintain his action, it was necessary for him to aver and prove that he was specially damaged or injured in that relation.

The quotation given from that opinion follows without change what was said in Curry v. Cabliss, 37 Mo. 330. In the last-named case the slander alleged was that defendant had spoken of plaintiff as being a ''bushwhacker.'' The word was one opprobrious, but it was not sought to apply it in any relation to the plaintiff's business.

In the later case of Noeninger v. Vogt, 88 Mo. 589, the slanderous words spoken, the subject of the first count, were: '' 'You are a defrauder; all that you have you accumulated by defrauding.' '' It was alleged there, that the defendant intended to charge the plaintiff with cheating and defrauding as a merchant and miller. In the opinion in that case it is stated, 1. c. 591: ''It is also alleged that the plaintiff was engaged in those occupations, and that the words were uttered of him in his said business.'' The decision in Rammell v. Otis, was referred to, as authority for the statement that any charge of dishonesty against an individual in connection with his business, whereby his character in such business may be injured or affected, is actionable; but we think the opinion does not otherwise follow the ruling in the Rammell case. It was held that the words, ''You are a defrauder; all that you have you accumulated by defrauding,'' the subject of the first count, did charge the plaintiff with fraud and dishonesty in his business, but evidently they were made to do so by force of averments connecting them with the plaintiff's business. It was held that the evidence tended to show they were spoken of the plaintiff in his occupation of merchant and miller, and in ruling that the trial court had erred in directing a verdict for defendant, Judge Black said, 1. c. 593: ''Language which imputes to one fraud, or want of integrity in his business, is actionable *per se,* and hence special damages need not be alleged. [Towns. on Lib. and Slan., sec. 192; Odgers Ib. (Bigelow's Ed.) 308; Cooley on Torts, 196.] In such cases a general diminution or loss of business may be proved, certainly so, where there is a general allegation to that effect in the petition, as is the case here. It is not necessary to name particular customers who have ceased to do business with the plaintiff.''

Upon what is stated in the opinion as to the facts and pleadings in the Rammell case and the Noeninger case, we are unable to reconcile the respective conclusions reached in these cases. In both, the words used were actionable only as applicable to the respective plaintiffs in

their business, and in each averments were required setting forth the nature of the business followed by the plaintiff, with allegation that the words were spoken of him in his said business.

In Mitchell v. Bradstreet Co., 116 Mo. 226, the publication was that the plaintiffs who were merchants had ''assigned'' and was held to be libelous *per se*. It was complete in itself, imputing insolvency, or that the plaintiffs had parted with dominion over their property as merchants, and was destructive of their credit. It was said at page 241: ''Every willful and unauthorized publication, written or printed, which imputes to a merchant or other business man conduct which is injurious to his character and standing as a merchant and business man, is libel and implies malice.'' And also said: ''Words written or spoken of one's trade are actionable when they might not be so, if spoken of the individual simply.''

Libel as defined by statute (Sec. 3613, R. S. 1919) ''is the malicious defamation of a person made public by any printing, (or) writing . . . tending to provoke him to wrath, or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence.'' The letter here in question does not of itself charge the plaintiffs with the statutory crime (Sec. 3348, R. S. 1919) of disposing of mortgaged chattels without the written consent of the mortgagee, and without informing the purchaser that the property was mortgaged, with intent to defraud the mortgagee. The letter in and of itself does not charge or necessarily impute fraud to plaintiffs. But it was alleged and shown that the letter was written under circumstances, and to such person as that to him it necessarily carried a meaning defamatory of plaintiffs as dealers in automobiles. It did not in itself, charge the plaintiffs sold the automobile knowing it to be mortgaged, but it did state that the bank had an unsatisfied mortgage upon the automobile sold to Deiter, and necessarily, as a party to the purchase he knew he had not been informed that the automobile was subject to mortgage, and he could not understand the letter otherwise than as a meaning that the automobile had been sold to him without the consent of the bank. Since he had purchased the automobile as being unincumbered, and paid the full purchase price, he would necessarily believe he had been defrauded. To him the letter was not ambiguous. The letter was written to him for the very reason that defendants knew he had purchased the automobile from the plaintiffs. The letter directly referred to plaintiffs under their trade name, and to a transaction in their business as such with Deiter. His knowledge of the transaction was merged in and completed the statement in the letter, and completed the imputation that plaintiffs in their character as dealers, had committed an act which tended to deprive them in that character, of the benefits of public confidence, and was destructive of their reputation as reliable persons

with whom to deal. Because of this, we are of the opinion that the letter was, *per se*, libelous of plaintiffs in their said business, and must be presumed to have occasioned damage; and that being so, it was not error to allow recovery of general damages.

Other questions raised are properly disposed of in the majority opinion, as follows:

"It is stated that the letter is qualifiedly privileged communication and therefore as plaintiffs did not prove actual malice, defendants'

**Privilege.** instruction in the nature of a demurrer to the evidence should have been given. The reason for this contention is stated as follows: 'On account of the fact that the purchaser of the cars was interested to the extent of any mortgage that might be held by the bank and the bank was interested in the cars to the extent of the mortgage that it held, these parties, therefore, had a corresponding interest in the property.'

"However, it will be remembered that there was no mortgage upon the car Deiter purchased. It is true that Cheek told the committee when it visited his place of business to determine the extent of the security the bank had for its mortgage, that he had sold one of the mortgaged cars to Deiter. This was stated under such circumstances as not to amount to a statement of a positive fact. Cheek suggested to the committee that he would examine his books to find out the true situation, but it was not sufficiently interested to have him do so. The strongest circumstances showing that the bank had no right to rely upon the indefinite statement made by Cheek at the time, was that they did not notify him of the purpose of the inquiry as to who were the owners of these cars, but, apparently, that it was made only incidentally. No intimation was given to Cheek that the purpose of the inquiry was to find out what cars had been sold so that the bank could claim a mortgage on them. There is ample evidence to show that the bank had as a matter of fact no right to claim that it had a mortgage on the Deiter car, even had the mortgages covered that car. So the statement of Cheek that it did is immaterial. The evidence is overwhelming, indeed, if there is conflict in it, that these cars even after Hull became cashier of the bank were being sold by plaintiffs with the consent, if not as a consequence of the urging, of the bank. Of course, the only reasonable inference to be drawn from this evidence is that it was understood that the plaintiffs were to sell these cars in the usual and natural course of business, which meant free from the mortgages. Under such circumstances the bank waived, as against the purchaser of the cars, any lien that they had against them. We think there is no question of privilege in this case.

"It is stated in Townshend on Slander and Libel (4 Ed.) section 241, page 395: 'Every one who, with reasonable cause for the belief, believes himself to be possessed of knowledge which, if true, does or

may affect the rights and interests of *another,* has the right, *in good faith,* to communicate such his belief *to that other.'* In this case the bank had no interest in the car and there was no duty of any kind on the part of the bank to communicate this information to Deiter, but it would seem that the communication was made from the viewpoint of the interest of the bank. The defendant Hull testified that the letters were written to let the purchasers know that the bank held a mortgage and 'held them' (the purchasers) 'responsible for these cars, and that is all.' If there was fraud in selling the car to Deiter, it had already been perpetrated upon him when the letter was written.

"Complaint is made of plaintiffs' Instruction 1, which reads as follows: 'If you find from the evidence that the letters or any of them, introduced in evidence were false, and were intended to impute and did impute to the plaintiffs the dishonest selling **Understanding** of a mortgaged car without notifying or letting the **of Addressee.** buyer know of the mortgage, and that such conduct would prejudice plaintiffs in their business or trade, or be injurious to the standing or credit as merchants or business men, then the plaintiffs are entitled to recover damages against those defendants who were responsible for or directed the sending of said letters, if any.' It is contended that in this instruction the question was not submitted to the jury as to whether or not Deiter understood the letter to have a defamatory meaning. While ordinarily a submission of this kind is necessary (See Lemaster v. Ellis, supra, l. c. 342, 343; Walker v. Hoeffner, 54 Mo. App. 554; Unterberger v. Scharff, 51 Mo. App. l. c. 110), but not always so (See Israel v. Israel, 109 Mo. App. l. c. 381), we do not think it was necessary under the undisputed facts in this case. The undisputed evidence shows that Deiter purchased the car under circumstances amounting to a representation that there was no mortgage upon the car, that if there was a mortgage upon the car, plaintiffs could hardly claim that they were ignorant of it without being convicted of culpable negligence or bad faith and that Deiter had no information of any claimed mortgage upon the car until he received the letter complained of from the defendants. Under such circumstances, as we have before stated, the moment Deiter received the letter he would at once know that it imputed dishonest dealing on the part of plaintiffs. The facts being undisputed and there being no doubt that Deiter could not have understood the letter otherwise than to have a defamatory meaning, we do not think it was necessary to submit this fact to the jury.

"Complaint is made of plaintiffs' Instruction 4, which reads as follows: 'The jury are instructed that there is no evidence that the car sold to Hugo Deiter was ever mortgaged. Therefore, if you believe from the evidence that the letter introduced in evidence was

mailed to said Deiter by the cashier, Hull, and was received by said

**Recklessness.** Deiter, then said letter was untrue, and if it was sent by said Hull and any other defendant, or by the direction of any other defendant or defendants, who recklessly or wantonly sent the same or caused the same to be sent to said Deiter, then such persons so sending or causing said letter to be sent, were guilty of libel.' The instruction could have been better worded, but we do not think that it was erroneous. It does not assume that the letter was recklessly or wantonly sent, and there was ample evidence to show that it was, in that the writer of the letter took no pains whatever to ascertain whether the Deiter case was in fact covered by the mortgage, but merely relied upon the statement of Cheek, which, in view of the circumstances under which it was made, was not a definite statement. The writer of the letter could have easily determined whether the Deiter car was in fact covered by the mortgage. Yet he wrote this letter without making any investigation as to the facts. However, it would seem that the instruction was harmless for, as we have before stated, in view of the undisputed circumstances under which it was sent, it was libelous *per se.*

"Instruction 7 is complained of. In the first part of the instruction is a submission of an abstract proposition of law to the effect that the law implies damages from the writing and publishing of **words charging** a crime. Whether or not a crime was charged in the

**Crime.** letter in view of the circumstances under which it was written, we need not say for the reason that we have already declared it to be libelous *per se.* For this reason we do not think that the instruction was materially erroneous. It was merely an instruction that told the jury that the 'defendants intended the injury the libel was calculated to effect, and the jury will find from the facts and circumstances in the case what damages ought to be given and are not confined to mere pecuniary loss or injury.' It is insisted that this is not a correct statement of the measure of damages. The instruction does not purport to cover this subject, but the measure of damages is properly covered in another instruction given on the part of plaintiffs. The jury could not have been misled.

"Plaintiffs' Instruction 8 is criticised for the reason that it is claimed that the jury could assess damages under the first count for the damages suffered by plaintiffs by reason of the writing of all of the letters. However, in plaintiffs' Instruction 9 the jury were instructed as to how they should assess damages under each

**Each Count:** count and they could not have been misled. There is
**All Letters.** nothing in the instructions to indicate that all of the damages caused by the letters complained of in all of the counts could be assessed on each count, but the contrary appears.

"From what we have said, there was no error in the refusal to give defendants' instructions.

"It is insisted, however, that the verdict is excessive and plaintiffs were only entitled to nominal damages. In this connection it is urged that the weight of authority on this question, although the question has not been directly passed upon in this State, is: '. . . that the author of a libel or slander incurs no liability, either as on a distinct cause of action or by way of enhancing the damages of the original defamation, for a voluntary and unauthorized repetition or republication of the libelous or slanderous matter by others who act independently.' However this may be, common sense tells us that the accusation of dishonest business dealings on the part of plaintiffs could have come into general circulation without Deiter's 'voluntarily' repeating it. The evidence shows that when the parties received those letters they immediately came to plaintiffs with their friends and attorneys. This was a natural and expected result from the writing of the letters and afforded ample opportunity for the libelous charges to circulate. Such information could not be said to have been given abroad by a '*voluntary and unauthorized*' repetition and republication of the libelous matter. We are not disposed to interfere with the size of the verdict in view of the evidence in this case. As was said in Minter v. Bradstreet Co., 174 Mo. 444, 504: 'The reason for holding parties so tenaciously to the damages found by the jury in personal torts is, that in cases of this class there is no scale by which the damages are to be graduated with certainty. They admit of no other test than the intelligence of a jury governed by a sense of justice.' "

It follows from the foregoing that the judgment should be affirmed. *Seddon, C.,* concurs.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur, except *Graves, J.,* absent.