ANDREW PROTO *v.* BRIDGEPORT HERALD CORPORATION

BROWN, JENNINGS, BALDWIN, INGLIS AND O'SULLIVAN, JS.

Argued February 8—decided April 11, 1950.

*Lawrence S. Finkelstone,* with whom, on the brief, were *George N. Finkelstone* and *Lawrence E. Levy,* for the appellant (defendant).

*Vincent Villano* and *Alfonse C. Fasano,* for the appellee (plaintiff).

INGLIS, J.   Upon the trial of this action for libel the jury returned a verdict for the plaintiff in the amount of $7000.   The defendant has appealed from the judgment and from the denial of its motion to set aside the verdict, assigning errors in the charge, in rulings on evidence and in the denial of its several motions for a mistrial and its motion to set aside the verdict, particularly upon the ground that it was excessive.   It has also assigned error in twenty-five paragraphs of the

court's finding. These latter assignments are entirely without merit and call for no discussion.

So far as they relate to the appeal from the judgment, the essential facts which the plaintiff offered evidence to prove and claimed to have proved are as follows: The plaintiff had been a resident of West Haven for nineteen years. After finishing the first year of high school he spent two years assisting his father in the conduct of a meat and grocery business in West Haven. He then entered the United States navy and served therein for twenty-nine months. After his discharge he purchased the business of a neighborhood grocery store in New Haven known as Tad's Corner Store and operated it from December, 1945, to August, 1946. The defendant published a weekly newspaper, known as the Sunday Herald, which had a wide circulation in West Haven and New Haven and indeed throughout the state. In the edition of that newspaper dated May 26, 1946, there was published the article set forth in the footnote.[1] It had been written by Elmer J. McCol-

[1] "STAN FAILS TO SUPPLY BLACK MARKET BUTTER

"CUSTOMER TAKES MONEY TO GET ILLEGAL LOT OF TABLETOP GOLD.

"Any undiscriminating consumers who shop at Tad's Corner store, 203 Spring st., New Haven, are hereby warned that they will not find an unlimited supply of black market butter there this week.

"That's the way things are, ladies, regardless of the efforts of Andrew Proto, manager of the store, to get you some butter outside the usual channels of supply.

"Andrew got stuck, but good, by a customer of his, Stanley Potonice, 25, 19 Hurlbert st., who told him he could get plenty of butter for him—at a price.

"The store manager made a deal with Stanley, giving him $20 on April 18 and another $10 on April 20.

"Stanley had informed him that, since he worked for the Sperry-Barnes company, it would be no trick at all to produce as much of the golden stuff as Andrew could sell.

"Visions of a horde of customers beating a path to his store—and of the hundreds of so-called tie-in-sales—a common practice throughout the state—that he could make—apparently dulled Proto's fears of OPA reprisals.

lum, a reporter employed by the defendant, and had been approved by F. William Davidson, who was in charge of the defendant's New Haven office. The article was based solely upon such information as McCollum had obtained from attending the proceedings against Potoniec in the City Court of New Haven referred to in the article and from reading the police record concerning that prosecution. The gist of the information so obtained was that on April 18 Potoniec had been in Proto's place of business and, after hearing him tell a customer that he had no butter to sell,

---

"ANDY IS DISMAYED.

"Stanley, however, had no connection with Sperry-Barnes and was, therefore, in no position to get the golden stuff for Andy.

"When he found this out, Andrew was naturally very, very unhappy.

"His dreams had been blasted.

"So Andy appealed to the authorities for, of all things, protection.

"The cops lost no time in picking up Stanley and a charge of taking money under false pretenses was lodged against him.

"When Stanley's case came up in city court this week before Judge Frank S. Bergin, there was no testimony.

"The gay deceiver pleaded nolo because the judge was looking at a lengthy record of the other occasions when Stanley had tried to fool some of the people some of the time and found the picking not so hot.

"It was put forth tentatively, however, that Stanley had not accepted Andy's cash, strictly speaking, as payment for the unproduced butter.

"The $30 allegedly was accepted by Stanley as a cash loan.

"Times, in Stanley's business, apparently are tough too.

"But Judge Bergin found little cause to discharge the state's case.

"SUSPENDED SENTENCE

"He pinned a 60-day suspended sentence on Stanley's coat-tails.

"Whatever melts in Stanley's mouth from this point onward will not be butter.

"Under federal regulations, according to the city attorney's office, Proto might be held equally liable with Stanley if he actually had secured even one pound of butter in the under-the-counter deal.

"In this case, however, the grocer, although the illegal intention was obvious, did not get any of the promised butter.

"Had he done so, he would have been prosecuted by the authorities also."

had persuaded Proto to hand him $20 upon his representation that, through his brother-in-law, he could acquire a case of butter for Proto for $15; that two days later Potoniec had reported to Proto that because his brother-in-law had been injured there would be a delay in getting the butter but that he now knew that he could get two cases of butter if Proto would advance him another $10; that Proto had then paid Potoniec $10 and that Potoniec had never delivered any butter. It was a matter of common knowledge that butter was in short supply. Neither McCollum nor Davidson had any information that the plaintiff had ever engaged in any "black-market" dealings or intended to or that he had made any "tie-in" sales or intended to. Prior to the publication of the article neither McCollum nor Davidson had made any effort to check the facts except as they had obtained them from the police report and at the hearing in the City Court. They had not interviewed the plaintiff nor had they talked with the city attorney or any official of the Office of Price Administration.

The plaintiff claimed that the publication was made with malice in the following particulars: The plaintiff was given no opportunity to see the article before it was published; it was not fair comment on news of public interest; it was not published in the performance of a duty owed the public; the defamatory charge was recklessly made in disregard of the plaintiff's rights and without regard to the consequences that might result to him and his reputation; the defamatory charge was made from improper and unjustifiable motives, including an intention to heap ridicule upon the plaintiff and to entertain the public to the embarrassment and humiliation of the plaintiff; there was no sufficient occasion or excuse for such publication; it was made from a desire to publish a sensational

story for the purpose of swelling the circulation of the defendant's paper; it manifested an entire indifference as to whether the charge was true or false and whether the plaintiff was injured or not; and the defendant used the publication to increase its profit and to minister to the public appetite for scandal.

At the time of the publication, the plaintiff claimed, there was no law or governmental regulation limiting the quantity of butter which might be sold or delivered to any retailer by a wholesaler, nor was there a minimum price which a wholesaler could charge for butter. The defendant, however, meant by the article that the plaintiff in his business was engaged in dishonest, unfair and illegal trade practices; that he exacted illegal, excessive and exorbitant prices for his goods; and that he was engaged in black-market activities in violation of federal price laws and regulations. The publication was false and defamatory. The article was read by many of the plaintiff's customers, friends and acquaintances; they were thereby led to stop patronizing the plaintiff's business, and a loss of profits resulted. The publication of the article caused the plaintiff great annoyance, embarrassment and shame.

The defendant offered evidence to prove and claimed that it had proved that the facts set forth in the article were true, that the article had been prepared by a reporter of long experience upon the basis of information obtained from official sources. It was published as current news in good faith, with an honest belief that the statements therein were true and a proper subject to be reported, and without malice. No retraction had been demanded. The defendant also claimed that the publication had no effect on the plaintiff's business and that the plaintiff had failed to prove any special damages of any sort.

The defendant claims that, in the charge to the jury, there were errors both of commission and of omission. No consideration should be given to the former except as they are connected with the latter, since the defendant failed to object to any of the portions of the charge as given which it now criticizes. Practice Book § 156. Instead, defendant's counsel addressed the court as appears in the footnote.[1] This statement by counsel could be regarded as a withdrawal or waiver of any exception to the charge. *Jacek* v. *Bacote,* 135 Conn. 702, 705, 68 A. 2d 144. We have decided, however, to consider the claimed errors of omission relating to the court's failure to comply with four of the defendant's requests to charge. Three of these requests were, in substance, that the plaintiff could not recover unless he proved both that the publication was false and that it was published with malice, or, lacking the latter, he could recover only if he proved special damage, and that as a matter of law the plaintiff had failed to prove either malice or special damage. It is apparent from the finding that there was evidence that as a result of the publication there had been a diminution of the plaintiff's business with consequent loss of profits. It is also apparent that there was evidence from which the jury could infer malice. It follows that the de-

---

[1] ". . . may I . . . commend you for the scholarly and judicial exposition of the law of libel that you have given to this jury. I am satisfied that it has taken hours of time and attention in a case which rarely comes to a court to try to a jury, and one with which most of the bench, and I should say by far the larger portion of the bar, are unfamiliar. Your charge was excellent, comprehensive and to the point. Were I to quarrel with any portion of it the only portion I could see any reason for excepting to would be on the question of damages by reason of the hostility which may have arisen by force of who have read the story and on the speculative quality of the amount of the profits which the plaintiff may have lost, but on the whole I do think that as far as guidance to the jury is concerned this tome of yours can well be quoted by others."

fendant was not entitled to a charge that as a matter of law these elements had not been proved.

In the charge the court distinctly told the jury that it was essential to a recovery by the plaintiff that the publication be found by them to be false. It read to them § 7983 of the General Statutes as follows: "In any action for a libel the defendant may give proof of intention; and unless the plaintiff shall prove either malice in fact or that the defendant, after having been requested by him in writing to retract the libelous charge, in as public a manner as that in which it was made, failed to do so within a reasonable time, he shall recover nothing but such actual damage as he may have specially alleged and proved." It then emphasized the fact that "the plaintiff must by a fair preponderance of the evidence prove malice in fact or he cannot recover, or he can recover nothing except such actual damages as he may have specifically alleged and proved." In another part of the charge the distinction between general damages and special damages was accurately explained. The court also fully and accurately defined malice in fact as not necessarily meaning hatred, spite or ill will against the plaintiff but as meaning that there must have been some improper or unjustifiable motive in publishing the article. *Sandora* v. *Times Co.*, 113 Conn. 574, 579, 582, note, 155 A. 819, and cases cited at p. 580. It is, therefore, clear that the court covered fully in the charge everything requested by the three requests in question in so far as they contained correct statements of the law applicable to the case.

The fourth request was that the court charge that the article complained of was not libelous per se and therefore that the plaintiff could not recover damages against this defendant in the absence of proof of special damage. The trial court refused to charge in

compliance with this request and, on the contrary, charged as follows: "The words in the article complained of, among other things, fairly import to charge the plaintiff with carrying on 'black market' operations as to butter in violation of the law and regulations. The words in the article tend to disparage the plaintiff in his business by intimating that he was dealing in 'black market' butter in violation of law and regulations. They tend to impute to him dishonest conduct in his business. The words in this article in so far as they refer to the plaintiff, if you find them to be proved to be false and malicious, and that the plaintiff has proved his case in accordance with the rules that I will discuss with you in this charge, then I charge you that the words would be libelous per se. When words are libelous per se the law presumes damage without special proof to that effect by the plaintiff." When a libel is expressed in clear and unambiguous terms, the question whether it is libelous per se is one of law for the court. *Carey* v. *Woodruff,* 89 Conn. 304, 308, 94 A. 281; *Flanagan* v. *McLane,* 87 Conn. 220, 222, 87 A. 727, 88 A. 96; *Donaghue* v. *Gaffy,* 54 Conn. 257, 266, 7 A. 552. The question is, therefore, whether the trial court was in error in determining that the libel here was actionable per se.

Whether a published article is libelous per se must be determined upon the face of the article itself. The statements contained therein, taking them in the sense in which common and reasonable minds would understand them, are determinative, and they may not for this purpose be varied or enlarged by innuendo. *Ventresca* v. *Kissner,* 105 Conn. 533, 535, 136 A. 90; *Arnott* v. *Standard Association,* 57 Conn. 86, 93, 17 A. 361. Two of the general classes of libel which, it is generally recognized, are actionable per se are (1) libels charging crimes and (2) libels which injure a man in his profes-

sion and calling. Newell, Slander & Libel (4th Ed.) § 8; Restatement, 3 Torts § 569, comments d, e. The question is: Does the publication complained of in this case, taken on its face, fall within either of those classes? To fall within the category of libels that are actionable per se because they charge crime, the libel must be one which charges a crime which involves moral turpitude or to which an infamous penalty is attached. *Yakavicze* v. *Valentukevicious,* 84 Conn. 350, 353, 80 A. 94; *Hoag* v. *Hatch,* 23 Conn. 585, 590; Newell, op cit., § 9. Because of the fact that at the time the article was published there was no longer any law or government regulation limiting the quantity of butter which might be sold, the charge of black-market trading might more properly be interpreted as a charge of unethical rather than illegal practice. But if the article were to be interpreted as charging an illegal act or practice, still there is nothing in the finding to the effect that the plaintiff claimed to have proved that it was a crime either involving moral turpitude or carrying an infamous penalty. Accordingly, the article was not libelous per se on the ground that it charged a crime. If the charge was open to the construction that the article was libelous per se because it charged a crime, it was in error.

It does not follow that such error was prejudicial. The jury were also instructed that the article was libelous per se because it charged the plaintiff with improper conduct and lack of integrity in his business. It is well settled that a libel is actionable per se if it charges improper conduct or lack of skill or integrity in one's profession or business and is of such a nature that it is calculated to cause injury to one in his profession or business. *Herman* v. *Post,* 98 Conn. 792, 793, 120 A. 606; *Pascone* v. *Morning Union Co.,* 79 Conn. 523, 525, 65 A. 972; *James* v. *Haymes,* 160 Va. 253, 262,

168 S. E. 333; *Myerson* v. *Hurlbut*, 98 F. 2d 232, 234, cert. denied, 305 U. S. 610, 59 S. Ct. 69, 83 L. Ed. 388; 53 C. J. S. 93. A distinction is recognized, however, in this connection between slander and libel. Restatement, 3 Torts § 569, comment e; Newell, Slander & Libel (4th Ed.) § 11. Spoken words are actionable per se only if they charge a general incompetence or lack of integrity. They are not slanderous per se if they charge no more than specific acts, unless those acts are so charged as to amount to an allegation of general incompetence or lack of integrity. *Herman* v. *Post*, supra, 793; *Camp* v. *Martin*, 23 Conn. 86, 91; *Sumner* v. *Utley*, 7 Conn. 257, 260; *Lewis* v. *Hawley*, 2 Day 495. Written words, on the other hand, are libelous per se if they charge only a single act, provided that act is something derogatory to the plaintiff in the operation of his business or in the practice of his profession; *Corsello* v. *Emerson Bros., Inc.*, 106 Conn. 127, 130, 137 A. 390; and if the charge is of such a nature that it is likely to injure the plaintiff in that business or profession. *Petrucelli* v. *Catapano*, 107 Conn. 122, 123, 139 A. 634; *Corsello* v. *Emerson Bros., Inc.*, supra, 131; *Eby* v. *Wilson*, 315 Mo. 1214, 1223, 289 S. W. 639; *Axton Fisher Tobacco Co.* v. *Evening Post Co.*, 169 Ky. 64, 77, 183 S. W. 269; *Gross Coal Co.* v. *Rose*, 126 Wis. 24, 27, 105 N. W. 225; 53 C J. S. 93, § 43. The facts in the *Gross* case just cited are somewhat analogous to those in the present case. In that case the statement, contained in a letter, was that the plaintiff, engaged in the coal business during a coal famine, charged extortionate prices and refused to sell at all to persons who were sick. The libel was held actionable per se.

In the case now before us the statement that the plaintiff would have engaged in black-market trading and tie-in sales if only he had been able to get the but-

ter he thought he was going to get is clearly a charge of highly improper conduct in the operation of his business. As regards the question whether the article was of a nature which would be likely to result in harm to the plaintiff's business, it must be borne in mind that it is not essential that a charge such as this be one which would drive away a majority of people or even a large minority. All that is essential is that it is calculated to affect a substantial number of customers. Certainly a substantial number of people would not trade with a grocer who they believed was dealing in the black market, with that term's connotation of exorbitant prices. Probably a still larger number would refrain from patronizing a store where they thought they would be required to purchase, by way of tie-in sales, merchandise they did not want in order to be allowed to purchase butter that they did want. There can be no serious question that a publication which alleged that a grocer was engaging and intending to engage in the black market and in tie-in sales would result in that grocer's losing the patronage of a substantial number of otherwise potential customers. It follows that the trial court was right in refusing to charge the jury in this case that the libel was not actionable per se.

Upon the trial of the case, after the jury had retired, the defendant claimed to the court that the officer's return of service of the original writ and complaint should not be allowed to go to the jury with the pleadings in the case, but stated no reason why it should be withheld. The court decided not to withhold the return from the jury and to this ruling the defendant excepted. This was a matter which lay in the discretion of the court, and error could be predicated only on an abuse of that discretion. Whether an officer's return should be allowed to go to a jury would depend

in part upon the question whether it was practicable to separate it from the writ and complaint upon which it was indorsed and in part upon whether it contained information which would prejudice the jury in the determination of the real issues in the case. In this case an examination of the file discloses that the officer's return was on a separate sheet attached to the complaint. It would, therefore, have been practicable to remove it from the complaint itself. However, it does not appear that any information contained in it either did or was apt to prejudice the jury. See *Barber* v. *Barber*, 33 Conn. 335. We cannot hold that the trial court abused its discretion in this regard.

The defendant assigns as error a total of twenty-eight rulings on evidence made either in denials of its motions to strike out or in the admission or exclusion of evidence over its objections. Only a few of these assignments call for any discussion. Evidence was admitted as to what was paid by the plaintiff for his grocery business when he bought it and what he received for it when he sold it. Any error which might have been committed by admitting that evidence when it was offered or by refusing to strike it out was cured by the charge, which withdrew from the consideration of the jury, as an element of damage, any loss on the sale of the business, the evidence being termed too speculative. The plaintiff was asked on direct examination why he had not kept a record of his receipts and disbursements during the last few months of the operation of his business, and he replied, over objection and exception, that it was because he was disgusted with the business. Under the circumstances, the objection should have been sustained because the question concerned the operation of the plaintiff's mind and was not relevant. However, it is apparent that no material

harm could have resulted to the defendant from its admission. It is not, therefore, reversible error. *Lusas* v. *St. Patrick's Roman Catholic Church,* 125 Conn. 206, 209, 4 A. 2d 333; *Devereux* v. *Armstrong,* 99 Conn. 158, 160, 121 A. 173; *State* v. *Stevens,* 65 Conn. 93, 95, 31 A. 496.

At the close of the evidence the defendant moved to strike out certain testimony as to nervousness, loss of sleep and loss of weight on the part of the plaintiff. The motion was denied. This motion was not then based upon the contention that no causal relationship had been established between the plaintiff's nervousness and the publication but only on the broad ground that "it does not appear that there is any support for it." The court charged the jury that "in the absence of any allegations for special damage for such physical suffering in this case, I charge you that you cannot award any damages for physical suffering as such, but you may consider it only . . . to show the severity or lack of severity of such mental suffering as you may find to have been caused by the publication." This charge put the evidence in the proper perspective and any error in denying the motion to strike out was harmless. Once during the taking of the evidence and twice during the final arguments of the plaintiff's counsel, the defendant moved for a mistrial. All of these motions were denied and properly so.

There is no error on the appeal from the judgment in this case.

Turning now to the appeal from the denial of the motion to set aside the verdict, inasmuch as the evidence clearly justified a finding of liability, it appears that the motion could be pressed only on the ground that the verdict of $7000 was excessive. There were three elements of damage for which the plaintiff was

entitled to recover. In the first place, he was entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the libel caused him. *Sandora* v. *Times Co.,* 113 Conn. 574, 581, 155 A. 819; *Petrucelli* v. *Catapano,* 107 Conn. 122, 123, 139 A. 634. Secondly, malice having been established, he was entitled to exemplary damages. *Sandora* v. *Times Co.,* supra, 582. Thirdly, he was entitled to such special damages as he could prove, which in this case were the loss of profits in his business.

Exemplary damages should be the cost to the plaintiff of the litigation less taxable costs. *Sandora* v. *Times Co.,* supra, 582; *Ventresca* v. *Kissner,* 105 Conn. 533, 538, 136 A. 90. In this case there was evidence, which the jury might well have believed, that the cost of this litigation less taxable costs would be about $1500.

As regards special damages, which consisted of a claimed loss of profits in the plaintiff's business, the defendant contends that the evidence did not justify the jury in finding that there was a causal relationship between the libel and any loss of business by the plaintiff and, in addition, that proof of actual loss of profits went no further than to be merely speculative. The jury were entitled to infer from the mere fact of the publication of the article in a newspaper with a large circulation in the area that the libel had come to the attention of the plaintiff's prospective customers. *Moore* v. *Stevenson,* 27 Conn. 14, 26. There was evidence both that, immediately following the publication, the business done in the plaintiff's store fell off in volume and continued to diminish until he sold the business in August and that after the publication the plaintiff failed to see in the store several customers

whom he had been in the habit of seeing before. In view of the fact that the libel was one which was calculated to injure the plaintiff's business, the jury might well have found that the libel was the cause of the loss of business. With reference to the amount of the loss sustained by the plaintiff, it is, of course, essential that such an amount be established with reasonable certainty. *Doeltz* v. *Longshore, Inc.,* 126 Conn. 597, 600, 13 A. 2d 505. However, that such damages are difficult of accurate determination does not prevent recovery of them. *Ball* v. *Pardy Construction Co.,* 108 Conn. 549, 551, 143 A. 855; *Tompkins, Inc.* v. *Bridgeport,* 94 Conn. 659, 684, 110 A. 193. So, in this case, the jury had evidence which it might have believed as to the gross sales made by the plaintiff for the few months before the libel and for the months after the libel until he sold his business. Also there was testimony that his net profit before the libel was 20 per cent of the gross sales. There was also evidence as to what his monthly profit was for the four months preceding and for the month and a half succeeding the libel. This evidence was a sufficient basis for the determination by the jury of the plaintiff's loss of profits with reasonable certainty. *Morse* v. *Times-Republican Printing Co.,* 124 Iowa 707, 725, 100 N. W. 867. It discloses that his total loss of profits resulting from the libel could reasonably have been found to have been $350.

The sum total of the defendant's exemplary and special damages is $1850. That being so, the only question remaining is whether the jury were justified in assessing his general damages at $5150. In view of the seriousness of the calumny published by the defendant and of the widespread publication given to it throughout the community in which the plaintiff had

been brought up, had attended school and had engaged in business, we cannot say that the amount is excessive.

There is no error.

In this opinion the other judges concurred.