# John C. Yavis *v.* Katherine T. Sullivan

Brown, C. J., Jennings, Baldwin, Inglis and O'Sullivan, Js.

Argued May 2—decided July 18, 1950—appeal from taxation
of costs decided November 14, 1950

*John V. O'Brien,* for the appellant (defendant).

*William J. Cousins,* for the appellee (plaintiff).

INGLIS, J. The complaint in this action charges slander in two counts. The plaintiff had a verdict for $4500 on the first count and $6500 on the second. The defendant appeals from the denial of her motion to set the verdict aside and also from the judgment on the grounds of claimed errors in rulings on evidence, in

allowing an amendment of the complaint, in the charge and in permitting certain papers attached to the writ and complaint to go to the jury.

The slander stated in the first count as amended was that during the summer of 1941 the defendant spoke in the hearing of sundry persons concerning the plaintiff as follows: "He tried to steal my money." "The man is nothing but a thief." "He takes advantage of widows and helpless people." "He tried to get my gilt-edged securities." The second count, as amended, alleged that during the summer of 1941 the defendant said to the same persons and to the plaintiff's wife: "He is no doctor." "He is rotten." "He owes everyone in town; he never pays anybody." "He is a rotten Greek and has no practice." "He should be honest to get on top." No special damage was alleged in either count.

The jury might reasonably have found the following facts: The plaintiff was a physician and surgeon born in Greece and admitted to practice there. He came to the United States in 1921 and, having interned at St. Raphael's Hospital in New Haven, was admitted to practice in Connecticut in 1923. While an intern he became acquainted with Dr. Jeremiah Sullivan, who was then an assistant surgeon on the staff of the hospital. The two became close friends and remained so until Dr. Sullivan's death in 1937. In 1933 Dr. Sullivan sold the plaintiff a cottage at West Silver Sands Beach, taking back a mortgage for $3000 as part of the purchase price. The defendant was an unmarried sister of Dr. Sullivan and kept house for him. She was, therefore, well acquainted with the plaintiff. After her brother's death in 1937, she became the executrix of his will. Included in his estate was the plaintiff's note and mortgage. In August, 1938, the plaintiff was being pressed by a bank either to reduce or to pledge additional security for several of his obligations to it. He

asked the defendant for her help by way of a loan of cash or securities from the estate of Dr. Sullivan. She flatly refused. In the hurricane of September, 1938, the plaintiff's shore cottage was swept away. A bare lot worth $500 was left as the only security for the unpaid balance of $2600 upon the note held by the defendant as executrix. In February, 1939, she brought suit on the note and attached other real estate of the plaintiff and his bank account. Attorney Anthony Arpaia, one of the persons mentioned in the complaint in this action, represented Dr. Yavis in that suit. Although the plaintiff did not contest his liability on the note, the action lay dormant for a long time and it was not until December 5, 1941, after the commencement of the present suit, that judgment was entered.

Even before she instituted action on the note, the defendant had begun the practice of calling the plaintiff on the telephone and vilifying him. This occurred on an average of once a week, commencing in the summer of 1938 immediately after the plaintiff had requested the loan of the defendant and continuing until the institution of the present action in September, 1941. The calls were made to both the home and the office of the plaintiff and sometimes guests or patients were present. During the same period, the plaintiff learned that the defendant was talking about him in derogatory terms to others, because he was frequently "kidded" about it by other doctors at St. Raphael's Hospital, where he was an assistant attending surgeon. All of this conduct on the part of the defendant greatly disturbed the plaintiff, embarrassed him and made him nervous and irritable, particularly with his wife and children.

With this general background, we come to the summer of 1941 and the specific slanders charged in the complaint. As bearing on the first count of the com-

plaint, there were three incidents. Each of them was a conversation between the defendant and Attorney Arpaia, who was then the attorney of record for the present plaintiff in the action brought against him by the present defendant. All three conversations were upon busy streets in New Haven, and the defendant spoke in loud tones and within the hearing of many passers-by. The first occasion was shortly after noon. The defendant accosted Arpaia on his way from lunch to his office and said, among other things, that Dr. Yavis was nothing but a thief, that he tried to steal her securities, that he was rotten, no good and no doctor, that he took advantage of widows and children and that he had no practice. She said, "You have to be honest to get along. He is rotten." A second occasion was at the corner of Temple and Center Streets in the afternoon. At that time the defendant used substantially the same words as she had before. The third conversation was on Chapel Street between College and High Streets. At that time the defendant told Arpaia that Dr. Yavis was rotten, that he was a dirty Greek, that he had no practice, and that he was a rotten doctor. She again said, "You have to be honest to get along." She also said that he had tried to steal her money or securities and that he was a thief. Arpaia then had no knowledge that Dr. Yavis had asked Miss Sullivan to loan him either money or securities. He did not really believe these accusations, but he began to wonder about Dr. Yavis and as a result the friendship which then existed between them cooled off. He reported the incidents to Dr. Yavis.

There were also several occasions when the defendant made statements substantially as alleged in the second count. On one of these, the defendant, while on the porch of her bungalow at West Silver Sands Beach, said, concerning Dr. Yavis, to a Mrs. Manning in the

presence of Mrs. Yavis, who was on the beach: "He is a rotten Greek; he has no practice at all. You have to be honest to be on top." This was said in such a loud tone of voice that it was intended to be heard by Mrs. Yavis. At another time, while Mrs. Photine Drakos, then a girl of fifteen years of age, her mother, Mrs. Miller, Mrs. Yavis and her two children were on the beach, the defendant called, apparently to Mrs. Yavis, "Does your friend know that [Dr. Yavis] is no doctor? He couldn't possibly be, because you have to be honest to have a practice." She further said that he was a crook and a rotten Greek. On one other occasion at the beach the defendant said, concerning Dr. Yavis, in the hearing of Mrs. Yavis, "He tried to get my gilt-edged securities. No one in the hospital will have anything to do with him. He owes everyone." Words of the same import and meaning were said frequently by the defendant in the presence of Mrs. Yavis during the summer of 1941. On still another occasion, the defendant, in loud tones, said to Frederick E. Petrelli on a busy street in front of the city hall in New Haven that Dr. Yavis had tried to beat her out of the money he owed her and "Jerry," that he had tried to take advantage of the gilt-edged bonds or stocks she had and that he was "nothing but a dirty crook . . . a dirty Greek crook." It is to be noted, however, that the words spoken to Mr. Petrelli were not slanderous per se and, therefore, could not in this action form the basis for any recovery.

The defendant was a woman of considerable standing in the community. In particular, because of her association with the medical profession through her brother and because she had made a gift to St. Raphael's Hospital, she was highly regarded among the doctors there. In 1941 she was sixty-three years of age.

The motion to set aside the verdict was upon three

grounds — that it was against the evidence, that it was contrary to the law and that it was excessive. As regards the first two of these grounds, the evidence was adequate, as already pointed out, to justify the jury in finding that the defendant had on several occasions spoken the words alleged in the complaint. She made no attempt to justify the utterances on the ground that they were true but denied that she had made them. Because no special damages were alleged or proved, however, the plaintiff was entitled to a verdict only if the claimed slanders were actionable per se. It is the contention of the defendant that they were not. Her claims in this regard are so closely allied with her assignments of error in the charge that they will be considered together.

The words spoken as proved under the first count of the complaint were in substance that the plaintiff was a thief and had tried to steal the defendant's money or securities. If these words were taken in their ordinary meaning, they charged an infamous crime involving moral turpitude and, accordingly, were actionable per se. *Hoag* v. *Hatch*, 23 Conn. 585, 590; Newell, Slander & Libel (4th Ed.) § 9. The real basis of the defendant's claim is that, if the words are taken in their context and under all of the circumstances, it would have to be found that they were not used in their ordinary sense, but rather that no more was meant or intended than that the plaintiff was a cheat and swindler. She requested the court so to charge the jury and has assigned as error what she claims was the failure of the court to comply with that request. Actually, the court in its charge, after instructing the jury that the only words set forth in the first count of the complaint which were slanderous per se were "He tried to steal my money" and "The man is nothing but a thief," went on to say that the other statements must be taken into considera-

tion as part of the surrounding circumstances. It then charged as follows: "Words claimed to be defamatory are to be given their ordinary meaning and to be understood in the sense which hearers of common and reasonable understanding would ascribe to them under all the circumstances surrounding the utterances at the time, and where their meaning is ambiguous, it is for the jury to determine what it was. In considering the surrounding circumstances you also consider any other words spoken at the time as bearing on the question of whether there was a slander per se or whether, although the words did in terms import a slander per se, they were so used as to make their ordinary meaning, under all the circumstances, mere abuse by an angry person." This not only fully complied with the defendant's requests to charge but also was an accurate statement of the law. *Yakavicze* v. *Valentukevicious*, 84 Conn. 350, 353, 80 A. 94. Since the jury were so instructed, it is to be presumed that they took into consideration the question whether the words "thief" and "tried to steal" reasonably conveyed to the hearers of them a meaning other than their ordinary meaning. The jury having considered that and come to the conclusion that the words were used in their ordinary meaning, it cannot be said that that conclusion was not in accord with the law. *Carey* v. *Woodruff*, 89 Conn. 304, 308, 94 A. 281.

As to the second count, the defendant requested the court to charge that the slanders alleged were not actionable per se and now contends that because they are not actionable per se the verdict on the second count is against the law and the evidence. The essential part of the slanders proved under this count was the defendant's statement that the plaintiff was no doctor and that he had no practice, because one has to be honest to get to the top. The necessary inference was that the plaintiff had no practice because he was not

honest. To make such a charge against a physician and surgeon is to accuse him of a lack of ability and integrity in his profession, a charge which by its very nature is calculated to injure him in that profession. Such a slander is actionable per se. *Proto* v. *Bridgeport Herald Corporation*, 136 Conn. 557, 566, 72 A. 2d 820; *Camp* v. *Martin*, 23 Conn. 86, 91; *Sumner* v. *Utley*, 7 Conn. 257, 261; *Lewis* v. *Hawley*, 2 Day 495. The court rightly refused the request to charge, and the verdict was not against the law and the evidence on that ground.

With regard to the claim that the verdict was excessive, it must first be noted that, as the proof came in, it is apparent that each count alleged at least three publications. This was not proper pleading. Each publication should have been alleged in a separate count. Practice Book § 33; 37 C. J. 21, § 327; 53 C. J. S. 136, § 84. By failing to move to separate or to elect, however, the defendant waived this defect, and the result is that we must consider the verdict on the first count as being for three publications of the slander to Arpaia and that on the second count as being for at least two publications to Mrs. Yavis and one to Mrs. Miller, Mrs. Drakos and Mrs. Yavis. *Macchio* v. *Breunig*, 125 Conn. 113, 116, 3 A. 2d 670.

The only proper element of damage on either count was the general damage resulting from injury to the plaintiff's reputation and to his feelings. No special damages were alleged. No punitive damages were recoverable because no evidence of the cost of the litigation was offered. *Chykirda* v. *Yanush*, 131 Conn. 565, 569, 41 A. 2d 449.

The only evidence of publication of the slanders alleged in the first count was that the three publications were to one and the same individual, Arpaia. Any inference that passers-by had heard enough of the slan-

derous statements to connect them with the plaintiff would be too much of a surmise to serve as a basis for damages. In any event, the complaint as amended did not allege any publication to them. The effect of the slanders upon Arpaia's relationship to the plaintiff, although substantial, could not have caused much injury to the plaintiff's reputation or feelings. The charges impugning the plaintiff's ability and integrity in his profession alleged in the second count could not have carried much weight with his own wife or with Mrs. Drakos and Mrs. Miller. Although the fact that they had been made might well have irritated the plaintiff exceedingly, it could not have seriously injured his reputation. The most probable explanation of the size of the verdict is that there came into evidence as bearing on the question of the presence of express malice the testimony of the plaintiff as to the harassment which he had suffered from the defendant's frequent telephone calls and also testimony by his wife and others as to the frequent repetition of slurring remarks made by the defendant. Indeed, the plaintiff's chief complaint of injured feelings was founded not on the slanders alleged in the complaint but on the telephone calls and the "kidding" by his fellow doctors, all of which occurred prior to the publications complained of. The jury might well have found that the defendant was a vindictive and vituperative woman; but, if they did, that would justify an enhancement of the general damages only to the extent that they found that the effect of the slanders upon the plaintiff's feelings was greater because of the defendant's great malice. *Craney* v. *Donovan*, 92 Conn. 236, 240, 102 A. 640. It is apparent that the jury awarded damages against the defendant in large measure because of injuries to reputation and hurt feelings which flowed from conduct by her which was not a part of the slanders alleged and

proved. Such injuries were not legitimate elements of damage for the specific slanders charged. *Ward* v. *Dick,* 47 Conn. 300, 302; *Swift* v. *Dickerman,* 31 Conn. 285, 290; *Williams* v. *Miner,* 18 Conn. 464, 472.

Just compensation for the slanders proved under the first count would not exceed $3500 and, for those proved under the second count, the same amount. In assessing damages in excess of those sums, the jury evinced a misunderstanding of the law that general damages in a case such as this must be merely compensatory. See *Hassett* v. *Carroll,* 85 Conn. 23, 38, 81 A. 1013. Accordingly, the verdict for the amounts as rendered should not be allowed to stand.

The only claimed error in the charge not already discussed is that the court refused a request to charge that an adverse inference would arise against the plaintiff by reason of his failure to call as witnesses various persons who he alleged in the complaint or in his disclosure had heard the slanderous statements. The trial court did charge that the failure of a party to call a witness who is in his control permits an inference that the testimony of that witness would have been adverse to the party. It also remarked that it had no recollection of any evidence that the witnesses who were not called were not equally in the control of both parties. This was a correct statement of the law and a fair comment on the evidence. It complied with the request so far as it was proper to do so. *Ezzo* v. *Geremiah,* 107 Conn. 670, 676, 142 A. 461.

None of the assignments of error in rulings on evidence have any merit. All of the rulings either were correct or were harmless to the defendant. The allowance of the amendment of the complaint while the trial was in progress was well within the discretion of the court.

On April 26, 1949, the fifth day after the verdict was

rendered, the defendant filed a motion for a new trial on the ground that certain papers not in evidence were taken to the jury room with the pleadings. The papers in question were an application for an injunction in aid of attachment of various shares of stock, the order thereon, the sheriff's return and a motion and order for the dissolution of the injunction. These papers were all stapled to the writ and complaint, and there was attached to them the file jacket which had indorsed on it a record of all steps taken in the case. The defendant assigns error in the denial of this motion for a new trial and argues that the jury must have been prejudiced against the defendant by reason of the fact that the papers showed that she had large assets. Her attorney had full opportunity during the trial to inspect the file and to discover that the documents referred to were going to be sent to the jury. He made no effort to do so, nor did he make any claim to the court that the papers should be kept from the jury. Counsel may not now be heard to complain that papers went into the jury room if they did so as a result of his own neglect. *State* v. *Tucker*, 75 Conn. 201, 203, 52 A. 741. Then, too, the information which was contained in the papers was not such as would be apt to prejudice the jury. *Proto* v. *Bridgeport Herald Corporation*, 136 Conn. 557, 568, 72 A. 2d 820; *Gimelli* v. *Waterbury Cadillac Co.*, 109 Conn. 722, 727, 145 A. 563.

There is error, the judgment on the first count is set aside and a new trial of the issues on that count is ordered unless the plaintiff within one month enters a remittitur of $1000 of the judgment on that count, but if such remittitur be entered the judgment as to the residue shall thereupon stand affirmed; and the judgment on the second count is set aside and a new trial of the issues on that count is ordered unless the plaintiff within one month enters a remittitur of $3000 of the

judgment on that count, but if such remittitur be entered the judgment as to the residue shall thereupon stand affirmed; costs in this court shall be taxed in favor of the appellant.

In this opinion the other judges concurred.

### ON APPEAL FROM TAXATION OF COSTS

In the taxation of the costs in connection with the judgment of this court, the clerk taxed in favor of the defendant as indemnity for the expense of printing the evidence on appeal the sum of $50, rather than the entire expense which amounted, it is alleged, to $435.10. From this taxation the defendant has taken this appeal.

The case was tried to the jury. The defendant appealed both from the judgment and from the denial of her motion to set aside the verdict. On the appeal she prevailed only to the extent that the verdict was set aside unless a remittitur was filed. In the record on appeal the evidence was printed for a dual purpose. It was for use in connection with the defendant's assignments of error looking to a correction of the finding and also as a basis for her claim that the verdict should have been set aside.

There are two sections of our rules which provide for taxing as costs the expense of printing the evidence. One of these is Practice Book, § 369. This relates to the printing of evidence upon an appeal from the denial of a motion to set aside a verdict. It provides that "such expense, not exceeding fifty dollars, may be taxed in favor of the prevailing party." It was in accordance with this section that the clerk taxed the costs in this case.

The other section is Practice Book, § 351. This section is within the division of the rules of appellate

procedure which relates exclusively to cases which have been tried to the court. It provides that in such cases an appellant, if he prevails, may have as part of his taxable costs the full expense to which he has been put, with a certain exception, for the printing of evidence in support of his assignments of error in the finding. It is under this section that the defendant claims in this appeal.

Inasmuch as this section in terms applies only to cases tried by the court and this case was tried to the jury, it would seem clear that it does not apply to this case. The defendant, however, claims that it does apply by reason of the provisions of Practice Book, § 356. That section reads in part: "The procedure to correct the finding in jury cases shall be in accordance with the procedure for correction of the finding in cases tried to the court, so far as applicable." The defendant's claim is that this means that the taxation of costs for the printing of evidence to correct a finding in a jury case is to be the same as the taxation of costs for the printing of the evidence to correct the finding in a court case. The answer to that claim is obvious. The taxation of costs which follows entry of judgment is no part of the procedure to correct the finding. Section 356 has no bearing upon the question of taxable costs.

As a matter of fact, there is no rule in the Practice Book that contemplates the taxation of any costs to indemnify a prevailing party for his expense of printing evidence for the sole purpose of securing the correction of the finding in a jury case. The only rule authorizing the taxation of the expense of printing evidence which is applicable to the present case is § 369, the section pursuant to which the clerk acted.

The appeal from the taxation of costs is denied.

In this opinion the other judges concurred.