[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO SET ASIDE VERDICT AND FOR NEW TRIAL BASED ON JUROR MISCONDUCT AND BIAS
In this personal injury case, a verdict was returned in favor of the CT Page 13553 defendant on May 2, 2000. A motion to set aside the verdict was filed, denied, reargument was had and the motion was again denied. The defendant, who now represents himself pro se, delivered some of the argument relative to matters now before the court prior to his lawyer's withdrawal from the case. The lawyer for the plaintiff filed a motion to withdraw in April of 2001, and this motion was granted on April 23rd of that year. The pro se plaintiff proceeded to represent himself and his renewed efforts to set aside the verdict and have a new trial center on behavior and possible prejudice against the plaintiff as regards three of the jurors.
First, it should be noted that the prime motivation of the plaintiff in making the allegations he does is that he is firmly convinced that he had in his language an undefeatable case and the verdict against him could only be explained by jury bias, misconduct, failure to follow the court's instructions, or total disregard of the evidence. This can be garnered from statements the plaintiff made on the record and from various written statements he placed into evidence. The court will discuss the questions Mr. Denniston raised as to each juror. The court, after hearing his concerns, did not permit two of the jurors to be called in to testify although Mr. Denniston wanted to subpoena them into court and was prepared to do so. The Court did permit the plaintiff to subpoena one of the jurors into court, reviewed questions submitted by Mr. Denniston and conducted its own questioning of this juror. Mr. Denniston also presented his own testimony, that of his wife and two sons and several sworn affidavits.
Mr. Denniston wishes to bring another witness or witnesses in to rebut the testimony of this juror. On the basis of the foregoing, the court must decide whether to deny what is apparently a renewed motion to set aside the verdict and/or a motion for a new trial because of juror bias and misconduct on the basis of the present record or to permit Mr. Denniston to present new evidence and witnesses based on what has already been presented.
The court will discuss the claims as to each juror separately, identifying them only by initials. The court will place in the file a sealed envelope which will indicate the full name of the jurors whom the court has identified by initials.
 (1) Juror J.B.
The problem throughout these post-verdict motions is that no transcript was made of the voir dire and at no point was a request made to transcribe any particular portion of the transcript. In a January 29, 2001 "Offer of Proof" made by counsel for the plaintiff when he was still CT Page 13554 represented, the following was said in a statement by the plaintiff attached to the offer — "J.B. told Mr. Collins that he had some run ins with the law, some arrests, no convictions, not guilty conclusions to his cases. A subpoena of his records will most likely reveal otherwise." In a sworn statement by Mr. Denniston, he states that during voir dire J.B. "stated he had no bias against policemen or ex-policemen, he said his brushes with the law were minor, not prosecuted and mostly a result of misunderstanding. I believe a record check will show otherwise." Mr. Denniston was a policeman many years ago. Not only are the previously quoted positions somewhat contradictory, but there is no basis given for the plaintiff's suspicions and conjectures about the man's record. Furthermore, Mr. Denniston was a police officer a very long time before this trial, so it would be difficult to now speculate on the possible bias or prejudice of a person for an individual who had not been a policeman for decades.
The chief concern expressed by the plaintiff regarding J.B., however, is his behavior and demeanor during trial. Mr. Denniston and his wife and two sons testified about this behavior. It was said J.B. displayed a negative attitude toward the plaintiff's case and its presentation. He rolled his eyes and even uttered what was apparently profanity in court. He complained about being on the case during the trial, scoffed, shook his head, expressed disbelief, expressed boredom, indicated testimony was repetitive and generally showed hostility." Mr. Denniston, at one point, said he heard J.B. discuss the case, but this was not elaborated on or further described.
The problem with these related series of complaints is that they were known to the plaintiff, his wife and two sons throughout the trial. Some of this was apparently even discussed with trial counsel. But no mention of it was ever made to the court — it only became a problem when a defendant's verdict was returned. As the court said in Bernier v.National Fence Co., 176 Conn. 622, 628 (1979): "A motion for a new trial for extrinsic causes will not be sustained if the ground of it existed at the time of trial and was either known to the petitioner at the time of trial or might have been known through the exercise of reasonable diligence," also see Yates v. Sullivan, 137 Conn. 253, 263-264 (1950). Furthermore, it should be noted that the court itself did not notice such behavior which seemed so obvious to people sitting not much closer to this juror during the trial and no court personnel ever informed the court of such behavior. Even if such conduct occurred a party cannot observe it, sit idly by at a point where if the court had been made aware of the conduct, it could have investigated and remedied the situation, then seek to overturn the results of the trial and burden the opposing side with a new trial after an unfavorable verdict. That would be completely unfair. CT Page 13555
The plaintiff further claims that his lawyer, with the court's permission, talked to the jurors after the verdict. J.B. apparently expressed disapproval of the crying of the plaintiff throughout the trial and also spoke of his tax returns in a biased way — he earned a relatively high income but paid little in the way of taxes. The juror said that he wished he could find himself in that situation or words to that effect.
As to the emotion displayed by the plaintiff during the trial, the court can understand why he was so emotional and does not mean to in any way criticize the plaintiff for his expressions of feelings. But it is true that the court observed the plaintiff cry fairly opening during the trial and while testimony was being presented.
Certainly as to witnesses who testify in court and jury trials, in civil and criminal trials the trier of fact can draw inferences from a witness' demeanor and standard jury instructions on witness credibility tell jurors they may do so. Filosi v. Hawkins, 1 Conn. App. 634, 641
(1984); State v. Gold, 180 Conn. 619, 633 (1980).
A party is in control of his or her own actions and when the party engages in behavior which could even be prejudicial to the other side because it appeals to jury sympathy, that party runs the risk that the jury could view the behavior as an attempt to sway them on the basis of emotion and not the facts. If a jury can explicitly take into account the demeanor of a party when he or she actually testifies — which would include displays of anger, crying, etc. — why can it not do so when it observes that same party and the way the party acts in court in reaction to evidence or argument. Besides, as noted, if a person is in control of his or her emotions, it does not seem fair for someone to react emotionally throughout the trial when he knows or should know such emotion might have an effect on jurors in a way positive to his or her case, then cry foul if there may have been a negative reaction to the display of emotion — a possible reaction, the risk of which also should have been apparent to the party engaging in the emotional display.
The juror's comment on the plaintiff's tax situation does not lead the court to the conclusion that such a remark displayed an attitude of mind which "either had or might have had an effect unfavorable to the party moving for a new trial," Pettibone v. Phelps, 13 Conn. 445, 450 (1840). The plaintiff's financial picture was not the critical factor in this case — there were many disputes over the use of the product claimed to be defective, whether the wood was defective, etc. This jury did not find liability and the amount of taxes the plaintiff paid or did not pay CT Page 13556 had nothing to do with resolving these issues.
 (2) Juror V.S.
Another juror whom the plaintiff wished to bring into court and whose conduct was the subject of the plaintiff's complaint was a juror, V.S.
What transpired with this juror causes the court real concern and also reflects on the deep suspicions Mr. Denniston had of the whole process before the jury even returned a verdict or started deliberating on his case. While the trial was going on, he and his family decided to "stake out," as they describe it, not only "Cash True Value," the defendant establishment, but also Home Depot. In a sworn statement by Mr. and Mrs. Denniston, they said there was an "anticipation" that jurors would show up at these stores — "there was a suspicion of at least two." The basis of any such suspicion was apparently based on a study of facial expressions, body language, etc., query was it of the juror now being challenged and why weren't those suspicions brought to the court's attention when something could have been done about it if there was any basis for them. In any event, there was some apprehension on the part of the Dennistons that one of the jurors might do some investigation on their own.
The whole family was involved in this endeavor. V.S. was observed entering the defendant's store with another woman and staying in there for some time and then leaving and going to Home Depot. At one point, several Denniston family members — all of whom came to the trial — entered the store and while walking down an aisle came upon V.S. She, it was said, "retreated" into another aisle when she observed the Dennistons coming down the aisle.
V.S. was never observed talking to any store employees of the defendant nor was she observed, for example, in the very department where the product that was the subject of this suit would be sold. At the beginning of trial, the court does admonish jurors not to do any investigation on their own. But there is no indication this juror did so concerning anything that was involved in this case. Also, the fact that V.S. and her friend went to two stores suggests that nothing peculiar to this case was involved. In any event, this occurred during trial; at no point did any of the Dennistons bring their observations to the attention of the court. At trial was the point at which the court could have looked into the matter and taken the protective action it deemed appropriate. The plaintiff and his family held this information to themselves and then several months after an unfavorable verdict cried foul, see Bernier v.National Fence Co., supra. CT Page 13557
What the court finds disturbing is that after several Dennistons confronted V.S. in the store aisle they did not bring this to the court's attention. The court would have liked to learn this information so it could inquire whether that experience would have had a deleterious effect on her service on the jury.
What the court at this point cannot countenance is the propriety of giving the party who created this problem and then did not inform the court of it so it could have protected both sides, giving that party a new trial. The court does not feel a new trial should be granted given what it has learned about the conduct of V.S. or of the party moving for a new trial.
 (3) Juror D.T.
What the plaintiff describes as his most serious concern is the fact that D.T. served on this jury. Through his own testimony and sworn statements the plaintiff presented certain background facts as to the basis of his concern. Mr. Denniston's problems centered on her acquaintance with his former wife and his allegation that he had a dispute with her over a bill D.T. claimed he owed to her employer. The court will discuss each matter separately.
 (a)
First, the court will discuss Mr. Denniston's concerns with the fact that he claims that D.T. had a close relationship with his ex-wife.
Some background facts need to be set forth to understand the plaintiff's position.
From what the court could gather, Mr. Denniston had been divorced from his first wife for over twenty years at the time of trial. He had two children with this woman. He represents that he had a very bitter divorce with this lady, there were problems surrounding contact with his children by this marriage. He described "thirty years of bitterness"in his relationship with his ex-wife which also involved false arrest and character attacks — the latter two matters were not further described but obviously sincerely disturbing to Mr. Denniston. He was ostracized from the world in which he lived by his wife's friends. After the trial, he conducted what appears to have been an extensive investigation of D.T. and her relationship with his ex-wife. He learned that they were classmates, her in-laws knew his ex-wife's in-laws, his ex-wife's parents were neighbors and friends of D.T. and went to her wedding. At a hearing on this matter, the plaintiff also testified that D.T. went to the wedding. His wife Gail Denniston at the same hearing CT Page 13558 said the ex-wife and D.T. were friends after high school which in D.T.'s case was in the range of 35 to 40 years before jury selection. D.T. also went to his wife's funeral and a gathering after the funeral. Mr. Denniston and his wife during testimony said his ex-wife and D.T. were part of a very close-knit ethnic community; they were in a neighborhood social club. Mr. Denniston's statement also descends into generalities; in an April 6, 2001 statement he says of this social club and referring to his exwife and D.T. (Exhibit 5): "They were both members along with their families, special occasions, weddings, etc., brought most of this community together." Gail Denniston testified also in April that this ethnic community had a lot of vengeance toward Mr. Denniston because of the situation with his ex-wife and the divorce — he could never get a fair trial from them.
But the April 6, 2001 document raises other concerns for the court than the mere generalizations of the accusations. It raises a question about Mr. Denniston's characterization of the closeness of the relationship between D.T. and his ex-wife. He, of course, does not deny the fact of his first marriage, he had children with the woman yet he apparently was not aware of the relationship D.T. had with this "close friend" of his wife while they were married or at any time before. At one point, Mr. Denniston says in his statement: "Their school years passed (referring apparently to D.T. and his ex-wife) while I lived in Europe, so I was not aware of the school or social friends. The small circle that I did meet after marriage did not include Mrs. T., there were many people, however, that do know all the story. These people filled in the blanks." If his ex-wife and D.T. were so close for all these years, why didn't he have any contact with her during those same years?
As indicated, Mr. Denniston did make other factual statements regarding the relationship of D.T. and his ex-wife — they shopped at the same grocery store, his ex-wife was a teller at D.T.'s bank, for example, but much of what was offered was based on speculation and surmise about close relationships in a tight knit ethnic community. In any event to establish the closeness of the relationship, Mr. Denniston offers and presently wishes to "bring in as many people as the court wishes" to back up (his) assertions, policemen, politicians, sheriffs, members of the (ethnic) community, classmates, school officials and photographs from class yearbooks."
The court did permit Mr. Denniston to subpoena D.T. into court to pursue his motions and did ask her several questions concerning her relationship with the ex-wife. Mr. Denniston made various comments on the transcript of this hearing which does not appear to have been marked as an exhibit but which Mr. Denniston submitted "as part of my offer of proof' along with comments. It is not clear if opposing counsel ever saw CT Page 13559 this or what the comments were in any event. Suffice it to say that D.T. testified that she knew the ex-wife, they were acquaintances more than friends. She seemed to say she knew her from school. They did not hang out together, but she saw her again, maybe a couple of tunes, at the beach when she was ill — she talked to her then more than she ever did. Apparently D.T.'s sister and the ex-wife had the same illness that led to the latter's eventual death. The comments by Mr. Denniston as to these remarks written by him basically assert D.T. was lying, she was constantly in the ex-wife's company, much of this was not revealed at voir dire. These comments are basically what Mr. Denniston has been saying all along and should come as no surprise to defense counsel. The court will mark this transcript and its comments as Court Exhibit AA.
The problem is that apart from general and global statements contradicting D.T. and assertions of her close and constant relationship with D.T. nothing very much has been offered in the way of specifics as to these allegations and when closely examined, D.T.'s testimony is not necessarily contradictory of the generalities made in the January, 2001 offer of proof.
An even more basic problem for Mr. Denniston's position is what occurred in the voir dire process and the way Mr. Denniston characterized the voir dire in the statement attached to his attorney's offer of proof in January, 2001. The court will quote from that document:
 "During the jury interview, Mrs. Tonucci was being questioned in the jury pool about as to prospective jurors knowing any of the parties in my case. Mrs. Tonucci explained that she knew me vaguely from a supermarket job, this was some forty years ago, and then she knew me only slightly. She promised she had no bias and would deliberate fairly and would not take one side over the other. She described a situation with her son, his injury and how he had been unfairly treated with his claim. But in spite of this, she thought that she could do a real good job. I told her I was impressed with her memory of me at 17 years old, now 60, and with no contact in between. My physical appearance greatly altered with time, my height, gait, color of hair, mustache, etc. amazing I said. Some questions went by when she turned to me directly and said, `I guess you know your ex-wife is terminally ill.' I was taken back. So her memory wasn't so great after all? She was aware that I had been married, to whom I was married and the well being of that person. I wanted right away to hear about the CT Page 13560 health situation of my ex-wife, we do share two children and numerous grandchildren and I wanted to do the right thing, so I wanted to know more. But the time wasn't right, nor was it the right place. I didn't put it together right away, the implications of this statement and its contradictions about only knowing me slightly from 40 years ago. A red tag did go up. I assumed she knew my ex-wife well. She knew of her current conditions, wow! I was very concerned and also concerned about my obligations to my children and grandchildren. Mrs. Tonucci continued to respond to both attorneys' questions, I thought it would be most improper to question her further although these thoughts and questions were on my mind. I went from easing up with her ongoing responses to the contradictions and so on. Finally she was asked to step outside of the room for a moment. Mr. Curran said she was acceptable to him and we should decide how we felt about her. I was totally opposed to her. Anyone knowing my ex-wife and her current health smelled like a friend of hers. Thirty years of bitterness, being deprived of my visitation rights, false arrest, character assassinations, abuse and just a terrible situation with her and her friends scared me to death. But Mr. Collins pointed out to me what he believed the realities of the situation. That she seemed sincere, he said. She claimed to only know me slightly some 40 years ago. She had a son that was injured and was jerked around. She could be a good juror for me. We have only a certain amount of objections at jury selection and the pool is running low. We have been at this for days and who knows we may have an objectionable person we will wind up with if we turn her down. What to do? What to do? With deep reluctance and much fear, Mrs. Tonucci was accepted. Mr. Collins believed she would be fair."
The problem with Mr. Denniston's position that D.T. made a misrepresentation in saying during voir dire she knew him slightly is that by his own statements submitted in this matter he, in fact, admits to not knowing D.T. Apart from the minor contacts D.T. alluded to, as previously mentioned during his marriage to his ex-wife, he apparently did not come into contact with D.T. or socialize with her through his ex-wife. In this respect, his position on this issue becomes a play on words — in other words, that she knew him slightly is true, but he argues it cannot be said D.T. knew of him slightly because she was close CT Page 13561 to his ex-wife and thus must have been told a lot about Mr. Denniston, all of it negative.
Beyond that, and more to the point, the plaintiff's own construction of the voir dire — there is no transcript of it — indicates he and his counsel never pursued the nature of the actual relationship between D.T. and his ex-wife. He said in his offer of proof: "I wanted to know more, but the time wasn't right, nor was it the right place. I didn't put it together right away."
What exactly was not put together? This woman, D.T., during voir dire on her own volition looked right at Mr. Denniston and said, "I guess you know your ex-wife is terminally ill." He said he was taken aback and "assumed she knew my ex-wife well." But as the questioning proceeded, "I thought it would be improper to question her further although these thoughts and questions were on my mind," "I assumed she knew my ex-wife well," etc.
Mr. Denniston had all the information he needed to protect his rights at the time of the voir dire but after talking with his lawyer decided not to challenge D.T. for cause or exercise a peremptory challenge which he apparently still had, cf. again Bernier v. National Fence Co., supra.
Even beyond that, if, in fact, D.T. at the time of voir dire had been questioned specifically about how well she knew the ex-wife — a topic not touched upon — and had, for example, revealed "only" (from the plaintiff's perspective) what she had stated in the transcript of her recent appearance in court — talks at the beach, knowledge of her illness — can it be seriously said that the plaintiff would not have had a motive in his own mind set to not have her on the jury? It would appear the answer is obvious — he was ready to excuse her just because she knew his ex-wife was terminally ill. Long after voir dire, the plaintiff now asserts he can show through what may be numerous witnesses that D.T. had a close relationship to his ex-wife — well, he assumed they had such a relationship from what D.T. said at the voir dire and did not pursue it or act upon it. In his own statement attached to the January, 2001 offer of proof he also added that at the time of the voir dire he was "totally opposed to her," she "scared me to death," "anyone knowing my ex-wife and her current health smelled like a friend of hers."
 (b)
The plaintiff raises another matter which he claims should entitle him to a new trial because of the possible bias of D.T. Some background information is necessary. Mr. Denniston had arranged to have the paper CT Page 13562 delivered to him; The Day newspaper delivery person apparently threw it over a fence so Denniston never received it. Mr. Denniston claims that he received a call from The Day. A woman who he claims is D.T. and who worked for The Day in the circulation and billing department discussed this $90 bill with him. He says she was rude and unpleasant and said if the bill was not paid the matter would be taken to small claims court.
The court has received different impressions as to how the plaintiff claims the lady he had a conversation with was D.T. At first, the court surmised that through lengthy investigation the plaintiff learned D.T. was the person at The Day who would make calls like this on delinquent bills. It was the court's further understanding that Mr. Denniston was prepared to bring in The Day employees who would testify that, in fact, this was her job assignment. It is now the court's understanding that Mr. Denniston's claims that during this phone conversation D.T. identified herself by name. His wife testified, in the court's understanding, to that effect. Also, Mr. Denniston submitted to the court toward the end of these proceedings a document never marked into evidence entitled "My Notes During Voir Dire (D.T.)." Defense counsel strongly objects to having the court consider it but the court will observe that in the latter portion of this document which the court will designate as Court Exhibit BB Mr. Denniston's version of what transpired is also mentioned. Therein, he claims that he received a call from someone at The Day about a bill owing, he denied owing the money, a few minutes went by and D.T. began talking to him after identifying herself by name and proceeded to make the hostile remarks previously noted. He said: "This entailed a conversation over the intercom, and everyone (four people) heard the whole thing. Three have filed affidavits to this affect (sic) and the fourth would if necessary will do the same. All four plus myself would and have testified under oath to this." It is unclear what Mr. Denniston is talking about at this point. If the "four people" referred to are The Day employees, no affidavits were ever presented to the court from these people. Only one person in the office was identified by name in addition to D.T. and what she was prepared to say was never indicated.
When D.T. was called in to testify on July 19, 2001, it was over a year and a-half after this purported conversation, which occurred about six months before the trial and was not brought to the court's attention until eight months after the trial. D.T. did testify and said she never makes calls on delinquent bills, that is not her job at The Day. She also denied speaking to Mr. Denniston in the last several years.
The problem here is that this matter has gone on for months while the plaintiff has investigated his suspicions and done extensive background checks which involved by his own estimation dozens of people in the very CT Page 13563 community where D.T. lives and works, which although not so intended has run the risk of intimidating a juror and making the price of jury duty extremely high. All this could only compound itself if a juror's co-workers could be made to come to court while general exploratory searches were made into their knowledge of a phone conversation and D.T.'s job duties regarding a phone conversation that occurred almost two years ago.
The court will now try to frankly state its position. It completely strains credulity to think that this plaintiff and his family who had such a distrust of the judicial process and the fairness of the trial that they staked out the defendant's and another company's store would not have connected D.T.'s name which they learned at the voir dire with a hostile, and apparently indelibly fixed on the memory call just six months earlier by a woman using the same name. This is especially so since at voir dire they knew D.T. worked in the circulation and accounting department at The Day — i.e. billing — and the very night after the voir dire Mr. Denniston mentioned to his wife this name and what she might know of the juror D.T. — Mrs. Denniston, who, after all, confirmed in testimony that D.T. identified herself by name during this call. And it should be noted that D.T.'s last name is not Smith or Jones but a distinctive name reflecting the ethnic community background Mr. Denniston has alluded to previously.
In any event, if this was such a hostile call we have been discussing, even if the name did not jog Mr. or Mrs. Denniston's memory, why would Mr. Denniston not have been alerted to the fact that this woman would have presented a problem because she worked for the circulation and accounting department at The Day newspaper. Presumably, that is the department concerned with billing, yet in the notes he made on the voir dire questions to D.T., his counsel did not inquire into this area at all. A problem is involved in this claim which runs through all the claims made here. As the court said in Bernier at page 628:
 "A motion for a new trial for extrinsic causes will not be sustained if the ground of it existed at the time of trial and was either known to the petitioner at the time of trial or might have been known through the exercise of due diligence. . . ."
 ". . . There can be but little difference in legal effect between actual knowledge . . . by the defendants (read plaintiff) at the time of trial, and their . . . negligence in not ascertaining it . . . And it would be unjust to subject the plaintiffs (read defendant) to a new trial, by reason of such CT Page 13564 negligence."
The court also concludes that this phone incident has loomed larger in these proceedings as it became clear that other problems with jurors were waived because they were known during the course of the trial, but not brought to the court's attention. What do we really have here? A dispute over a $90 paper delivery bill that occurred several months before trial in a call where an employee of The Day, presumably salaried, was advancing her employer's interest in collecting this small bill, not pursuing a debt personal to her. Massive litigation was not threatened, just small claims court.
More to the point, the real basis of the complaint here cannot be the nature of the call and what D.T. said if she did talk to the plaintiff about the money he owed The Day. For Mr. Denniston, D.T.'s coming to court and lying about having this conversation ties in with his larger conspiracy theory that D.T. was a close friend of his ex-wife who saw her opportunity to sit on this jury as a chance to work vengeance on Mr. Denniston. At one point, he described D.T. as feeling like she must have won the lottery. But as previously discussed, the offers of proof made here rely on too many generalities to support the over-arching superstructure that the plaintiff relies on to set aside the verdict.
If D.T. did have the close relationship to his ex-wife the plaintiff now claims and her testimony before the court was only a further extension of her hostility based on that relationship, then this risk or danger was known to him at the time of voir dire by his own admission as previously discussed.
If D.T. did not have any such relationship then why on earth would she lie about this phone call and what possible motive would she have for doing so? And under such circumstances what possible significance can the court attach to her responses regarding an area of inquiry not even explored in the voir dire? By the time this lady was called to testify in July. 2001, a massive investigation had been conducted into her background and life by the Dennistons. Dozens of people in her community who knew her were approached. It could appear that at least a half dozen of her co-workers were approached by the Dennistons' Could this be a reason why she wanted to speak to a lawyer before she came to court — or even a reason why in July of 2001 she denied this conversation?
In any event, if D.T. did not have the close relationship with the ex-wife now claimed, how can it be said — if, in fact, she had the conversation — that she harbored such a deep resentment against Mr. Denniston over this $90 bill owed to her employer that she violated CT Page 13565 her juror's oath and found against him despite the evidence and law which to the plaintiff dictated only a result favorable to him?
In any event, none of the reasons offered by the plaintiff for setting aside this verdict or granting a new trial are persuasive to the court and the motions are denied.
Corradino, J.